IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KANZA YAWILI,

Petitioner, 2: 10 - cv - 2867 - TJB

vs.

PEOPLE OF THE STATE OF CALIFORNIA,

Respondent. ORDER

___________________________________/

I. INTRODUCTION

Petitioner is a state prisoner and is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 636(c)(1), Petitioner and Respondent have consented to have a United States Magistrate Judge conduct all further proceedings in this case.

Petitioner was convicted by a jury of making a criminal threat in violation of California Penal Code § 422. The jury also found true an allegation that he personally used a firearm while making the threat. Petitioner received a sentence of fours years and four months imprisonment. Petitioner raises three claims in the instant federal habeas petition; specifically: (1) Petitioner's statements which formed the basis of the making criminal threats conviction were protected by

the First Amendment ("Claim I"); (2) there was insufficient evidence to support the conviction of making criminal threats ("Claim II"); and (3) there was insufficient evidence to support the firearm enhancement ("Claim III"). For the following reasons, the habeas petition will be denied.

## II. FACTUAL BACKGROUND[1]

> Aaron Langston worked for Blackstone Communications, a company that installed "Direct TV." The equipment the company used was located at Public Storage in Sacramento County, where employees would pick up equipment and start their routes. Defendant's wife, Sarah Windham, was Langston's boss.
>
> Windham's and Langston's relationship was friendly but not sexual. In April 2008, defendant walked in on Windham and Langston "joking around" and laughing at the Public Storage facility and misconstrued their behavior. Langston explained "nothing was going on," shook defendant's hand, and "thought everything was kosher."
>
> On the morning of May 15, 2008, Langston and his roommate, Robert Taylor, who helped Langston out occasionally, went to Public Storage to begin work. They picked up materials from the storage facility, and as they were leaving to begin their route, they saw defendant and Windham yelling at each other. Langston became concerned because Windham previously told him that defendant had been violent with her. He decided to come back 5 or 10 minutes later and make sure everything was okay. When he did, Windham "looked roughed up," like she had "just . . . been in a . . . wrestling match." She had lumps on the back of her head, and she said defendant had "t[aken] her by the hair and then slammed her head up against the car a couple of times."
>
> Defendant went to his car and removed what looked like a gun. Holding the gun at his side, he asked if any of them "had anymore to say to him." "[O]f course, nobody said anything." Defendant then got in his car and drove away. Langston called 911.
>
> Five or 10 minutes later, Windham got in her car to drive to Wal-Mart for baby formula. Five minutes later, Windham called Langston to report defendant was "right up behind her, following her." Langston told her not to stop. Believing Windham was in danger, he headed to Wal-Mart in his truck.
>
> At Wal-Mart's parking lot, Langston found neither Windham nor

[1] The factual background is taken from the Court of Appeal of the State of California, Third Appellate District opinion on direct appeal dated March 30, 2010 which was attached to Respondent's answer (hereinafter the "Slip Op.").

defendant. He drove back to Public Storage to wait for police.

Windham returned to Public Storage, and 10 minutes later, so did defendant. As he parked at the gate, police pulled up behind him. They first confirmed with Langston and Windham that defendant was the "'guy [who] the phone call was about.'" Police put defendant in the backseat of the patrol car because the dispatch call mentioned the possibility of a gun. Defendant said he had a "child's toy [gun]" in his car. In the rear of defendant's car, police found a fake plastic airsoft gun.

A police officer talked to Langston and Windham about what had happened. Windham said nothing had occurred. Langston said, "[L]ook at the security camera . . . [and] any of [your] questions would be answered." Langston was "[n]ot really" cooperative with law enforcement because Windham had told him not to mention the gun. The police decided "[n]othing [had] occurred" and left after 10 or 15 minutes.

After police left, defendant started "taunting" Langston, saying, "'Did you really believe that she'd ever have me arrested?'"

Defendant then went to the back of his car and opened the rear hatchback. He pulled out a second gun, and, while five feet away from Langston, "flashed it," saying "'I guessed they missed one. I'll see you later. I'm going to fuck your girl.'" Langston told defendant, "'fuck you'" and "took off."

Langston described defendant's comments as a "threat [ ]." He understood them to mean defendant was "not happy about having the police called, and that he's going to find out where [Langston] live[s], or already knows where [he] live[s], and then come and get retribution." Langston was "[a]bsolutely fearful "at this point." He was "[a]bsolutely" fearful defendant would make good on his threats because if defendant "ha[d] the nerve to [pull out a gun], [Langston] ha[d] no reason to think that he w[ould]'t do everything else he said."

Langston described the second gun as a semiautomatic Beretta with a rounded top, weighing about five pounds, that "[a]bsolutely appeared real to him. Even though the first one may not have been, he believed the second one was.

When Langston left Public Storage, he did not go on his route, but went home and told his girlfriend what had happened. She become scared.

That day, Langston received about 10 voice mails from defendant – all "threatening." In some of them, defendant recited Langston's address and Social Security number, asked him for $500 "to pay for what [Langston had] d[one] with calling the police and having

> him put in the back of a police car," and said he was "'going to rape [Langston's] wife.'" Defendant also sent a text message to Langston's coworker, saying "I'm on my way to his house." The coworker forwarded the message to Langston.
>
> Langston and his girlfriend drove to the police station to file a report and get a restraining order. They then spent the night at a friends's house.

(Slip Op. at p. 2-5.)

III. PROCEDURAL HISTORY

Petitioner appealed his conviction and sentence to the California Court of Appeal. Most relevant to the instant federal habeas petition, Petitioner argued that there was insufficient evidence to convict him of making criminal threats. Within that argument, Petitioner asserted that his speech and conduct at Public Storage were an exercise of his First Amendment rights. Additionally, Petitioner argued that there was insufficient evidence for the gun enhancement. The Court of Appeal affirmed the judgment on March 30, 2010. Petitioner then filed a petition for review in the California Supreme Court. In that petition for review, Petitioner argued that there was insufficient evidence to support the making criminal threats conviction. However, in that brief, Petitioner did not argue that his conduct and speech at Public Storage were protected by the First Amendment. Petitioner's second argument in that brief was that there was insufficient evidence to support the gun enhancement. The California Supreme Court summarily denied Petitioner's petition for review on September 1, 2010.

Petitioner filed the instant federal habeas petition in October 2010. Petitioner then filed an amended petition and then a second amended federal habeas petition in December 2010. Respondent answered the second amended petition in April 2011. Petitioner filed a traverse in May 2011.

IV. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States. See 28

U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. See Lindh v. Murphy, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. See 28 U.S.C. 2254(d). When no state court has reached the merits of a claim, *de novo* review applies. See Chaker v. Crogan, 428 F.3d 1215, 1221 (9th Cir. 2005).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" Id. (citations omitted). Under the unreasonable application clause, a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." See Williams v. Taylor, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is an objectively unreasonable application of clearly established federal law. See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

the Supreme Court's precedents are binding . . . and only those precedents need be reasonably applied, we may look for guidance to circuit precedents.").

V. ANALYSIS OF PETITIONER'S CLAIMS

A. Claims I & II

With respect to Claim I, Respondent asserts that Claim I is unexhausted as Petitioner never presented it to the California Supreme Court. Nevertheless, Respondent states that Claim I "can and should" be denied on the merits. (See Resp't's Answer at p. 6.) Assuming *arguendo* that Claim I is unexhausted, the merits can still be reached. An unexhausted claim can be denied on the merits when it is perfectly clear that the claim is not "colorable." See Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).

Claims I and II overlap as they both relate to whether Petitioner's conviction for making criminal threats was improper. In the context of analyzing Petitioner's arguments, the California Court of Appeal stated the following:

> Defendant contends there was insufficient evidence he made a criminal threat. He focuses on the incident at Public Storage with the real gun, claiming that although unanimity instructions were given, the prosecutor elected to base the charge on this incident. We agree regarding the prosecutor's election but disagree there was insufficient evidence of that incident.
>
> The elements of making a criminal threat are: (1) the defendant "'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,'" (2) the defendant made a threat "'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,'" (3) the threat was "'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,'" (4) the threat actually caused the person threatened "'to be in sustained fear for his or her own safety or for his or her immediate family's safety,'" and (5) the threatened person's fear was "'reasonabl[e]'" under the circumstances. (People v. Toledo (2001) 26 Cal.4th 221, 227-228.)
>
> Defendant claims there was insufficient evidence of these elements, and we should not take into account evidence of voice mail messages because they were improperly admitted and his

counsel was ineffective to the extent he failed to object. He argues his actions and statements to Langston were "simply emotional outbursts" that were not criminal and that were protected by his constitutional right to free speech.

Leaving aside the voice mail messages, there was sufficient evidence defendant made a criminal threat as that term is defined in the Penal Code, which was not protected speech. Defendant flashed a real gun, and while five feet away from Langston, told him, "'I'll see you later. I'm going to fuck your girl.'" The flashing of a gun near Langston coupled with the statement "'I'll see *you* later'" (italics added) and "'I'm going to fuck your girl'" was a threat both to Langston that he would harm him with the gun and to his girlfriend that he would commit a sexual assault on her. That defendant intended his statements to be taken as a threat could be implied by defendant's use of a gun. Otherwise, there was little reason to take out the gun. The threat was "'*sufficently* unequivocal, unconditional, immediate, and specific" to convey to Langston "'a gravity of purpose and immediate prospect of execution.'" (People v. Hamlin (2009) 170 Cal.App.4th 1412, 1433.) Langston had just called 911 on defendant because he feared for Windham, a woman to whom defendant was married and whom defendant suspected had acted inappropriately with Langston. Langston had reason to believe defendant knew where he lived because, although he had moved recently, Windham knew his address and Langston believed defendant had influence over her. The threat actually caused Langston to fear for his safety and for his girlfriend's safety. He had decided not to finish his route and instead went home to tell his girlfriend what had happened. They did not sleep in their own house that night. As Langston put it, he was "[a]bsolutely" fearful defendant would make good on his threats because if defendant "ha[d] the nerve to [pull out a gun], [Langston] ha[d] no reason to think that he "w[ould]'t do everything else he said." [FN 1] Finally, Langston's fear was reasonable. Defendant had just beaten up his wife, leaving her "roughed up" with "lumps on the back of her head." [FN 2] Under these circumstances, it was reasonable to believe that defendant, who had just flashed a gun near Langston even after police had been on scene, was capable of using a gun to harm Langston and his girlfriend. On this record, there was sufficient evidence to support defendant's criminal threats conviction.

> [FN 1] At one point in his argument, defendant notes comments by the prosecutor and by the court at sentencing that Langston was not in fear at Public Storage. However, we are not concerned with the prosecutor's or trial court's view of the evidence. We are concerned with whether there was sufficient evidence presented to the jury from which it could make a finding of guilt as to all elements of the crime.

> [FN 2] This is a fair inference from the evidence, leaving aside Windham's statements about the altercation. Langston had seen Windham and defendant arguing and then observed Windham's disheveled look and lumps on the back of her head.

(Slip Op. at p. 5-8.)

Petitioner asserts that the statements he made giving rise to the making criminal threats conviction were protected by the First Amendment. The California courts have rejected contentions that Penal Code § 422 violates the First Amendment. See People v. Toledo, 26 Cal. 4th 221, 233, 109 Cal. Rptr. 2d 315, 26 P.3d 1051 (2001) (section 422 is not unconstitutionally overbroad). Petitioner cites to no federal cases which have invalidated section 422 on First Amendment grounds. Cf. Planned Parenthood of Columbia/Williamette, Inc. v. Am. Coalition of Life Activists, 290 F.3d 1058, 1075 (9th Cir. 2002) (en banc) ("A true threat, that is one where a reasonable person would foresee that the listener will believe he is subjected to physical violence upon his person, is unprotected by the first amendment.") (internal quotation marks and citations omitted). The United States Supreme Court has upheld the constitutionality of criminal threats statutes. See Watts v. United States, 394 U.S. 705, 707 (1969). In Virginia v. Black, 538 U.S. 343, 359 (2003), the Supreme Court held that the First Amendment permits a State to ban a "true threat." In explaining what constitutes a "true threat," the Supreme Court explained that:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur."

Id. at 259-60 (internal citations omitted). Accordingly, Petitioner fails to show that he is entitled to federal habeas relief on his argument that his § 422 conviction for making criminal threats violated the First Amendment.

In Claim II, Petitioner argues that there was insufficient evidence to convict him of

making criminal threats. The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction, if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). A petitioner for a federal writ of habeas corpus "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. V. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the writ, the habeas court must find that the decision of the state court reflected an unreasonable application of Jackson and Winship to the facts of the case. See id.

A federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. See Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983. Petitioner was convicted of violating California Penal Code § 422. That section states:

> Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison.

Cal. Penal Code § 422(a).

Thus, to be found guilty of this crime, the prosecution must prove five distinct elements: (1) the defendant willfully threatened to commit a crime which will result in death or great bodily injury to another person; (2) the defendant made the threat with the specific intent that the statement is to be taken as a threat, even if the defendant has no intent of actually carrying it out; (3) that the threat–which may be made verbally, in writing, or by electronic communication device–was on its face and under the circumstances in which it was made so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and immediate prospect of execution of the threat; (4) the threat actually caused the person threatened to be in sustained fear for his or her own safety or for his or her immediate family's safety; and, (5) that the threatened person's fear was reasonable under the circumstances. See Toledo, 26 Cal. 4th at 227-28, 109 Cal. Rptr. 2d 315, 26 P.3d 1051.

When the evidence is viewed in the light most favorable to the prosecution, Petitioner is not entitled to federal habeas relief on this Claim. Petitioner first asserts that his statements were not death threats nor threats of great bodily injury to Langston. However, while holding a gun only a few feet away from Langston, Petitioner told Langston, "'I guess they missed one. I'll see you later. I'm going to fuck your girl.'" (Reporter's Tr. at p. 325.) The state court's determination that this constituted a threat to Langston was not an unreasonable application of clearly established federal law nor did it result in an unreasonable determination of the facts in light of the record produced at trial. As stated by the state court, the statements could be construed as a threat to Langston as Petitioner went and got a gun and was holding the gun when he made the threatening statements at issue.

Petitioner also argues that the statements were not so unequivocal and unconditional, immediate and specific as to convey to the person threatened, a gravity of purpose and immediate prospect of execution of the threat. (See Pet'r's Second Am. Pet. at p. 19.) Petitioner asserts that there was no immediacy to his statements such that there was insufficient evidence to sustain the conviction based on the third element of proving a section 422 charge. As explained by the state

court, Langston had just called 911 on Petitioner because he feared for Windham, a woman to whom Petitioner was married and whom Petitioner suspected had acted inappropriately with Langston. Langston had reason to believe Petitioner knew where he lived because, although he had moved recently, Windham knew his address and Langston believed Petitioner had influence over her. (See Reporter's Tr. at p. 333.) When this evidence is viewed in the light most favorable to the prosecution, Petitioner failed to show that the decision was an unreasonable application of clearly established federal law or that it resulted in an unreasonable determination of the facts in light of the record produced at trial.

Third, Petitioner asserts that Langston was not reasonable in fearing Petitioner. (See id. at p. 20.) As noted by the state court, Petitioner had just beaten up his wife, leaving her "roughed up" with "lumps on the back of her head." Thus, the decision was not an unreasonable application of clearly established federal law nor was it based on an unreasonable determination of the facts. It was reasonable to believe that Petitioner, who had just flashed a gun near Langston even after police had been on scene, was capable of using a gun to harm Langston and his girlfriend. For these reasons, Claim II will be denied.

B. Claim III

In Claim III, Petitioner asserts that there was insufficient evidence for the jury to find that he used a firearm while threatening Langston. Petitioner argues that because he used a fake gun in his first encounter with Langston, it was speculation to conclude that Petitioner possessed a real gun during the second encounter with Langston. The last reasoned decision on this Claim was from the California Court of Appeal on direct appeal which stated the following:

> Defendant contends there was insufficient evidence of the gun enhancement, arguing it was "speculation to conclude [he] used a real gun during the second incident instead of another fake gun." According to defendant, "[b]ecause [he] kept [his] replica Glock in the back seat of his SUV . . . it was just as likely the second purported gun, the Beretta gun, that [he] retrieved only minutes later from the same vehicle was also a replica toy gun." Defendant's argument turns the standard of review on its head.

> Here, viewed in the light most favorable *to the People*, as we must on a sufficiency of evidence review (People v. Sanghera (2006) 139 Cal.App.4th 1567, 1574), there was evidence from which the jury could have found that the gun in the second incident was real. Defendant took out what appeared to be a gun, "flashed it" five feet away from Langston, saying, "'I guessed they missed one. I'll see you later. I'm going to fuck your girl.'" According to Langston, the gun was a semiautomatic Beretta with a rounded top weighing about five pounds that "[a]bsolutely" appeared real to him.
>
> This court has held the People can rely on the victim's perception the firearm was real, along with the defendant's "'own words and conduct,'" to prove a firearm enhancement. (People v. Monjares (2008) 164 Cal.App.4th 1432, 1435-1437.) Here, defendant's conduct in using the gun to threaten Langston and his girlfriend and Langston's perception the firearm was real were sufficient to prove it was.

(Slip Op. at p. 8-9 (emphasis in original).)

The standard on a sufficiency of the evidence argument has been set forth in supra Part V.A. When the evidence is viewed in the light most favorable to the prosecution, there was sufficient evidence to support the gun enhancement. As noted by the state court, Langston testified that the gun "absolutely" appeared real to him. (See Reporter's Tr. at p. 327.) The state court then examined the other circumstances which included Petitioner's words and actions in determining that there was sufficient evidence to sustain the gun enhancement. It specifically noted Petitioner used the gun to threaten Langston and his girlfriend. Based on this record, Petitioner fails to show that the state court's decision was an unreasonable application of clearly established federal law or resulted in a decision based on an unreasonable determination of the facts. See People v. Monjaras, 164 Cal. App. 4th 1432, 1437, 79 Cal. Rptr. 3d 926 (2008) ("the object's appearance and the defendant's conduct and words in using it may constitute sufficient evidence to support a finding that it was a firearm"). Accordingly, Claim III will be denied.

## VI. PETITIONER'S REQUESTS

### A. Evidentiary Hearing

Petitioner requests an evidentiary hearing. A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support

petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate." Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005). A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief." Earp, 431 F.3d at 1167 (citations omitted). To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would entitle him to relief." Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted). In this case, an evidentiary hearing is not warranted for the reasons stated in supra Part V. Petitioner failed to demonstrate that he has a colorable claim for federal habeas relief. Moreover, the Supreme Court has recently held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing on" such review. Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 1400 (2011). Thus, his request will be denied.

B. Appointment of Counsel

Petitioner also requests the appointment of counsel. There currently exists no absolute right to the appointment of counsel in habeas proceedings. See, e.g., Nevius v. Sumner, 105 F.3d 453, 460 (9th Cir. 1996). However, 18 U.S.C. § 3006A authorizes the appointment of counsel at any stage of the case "if the interests of justice so require." In the present case, the interest of justice does not so require the appointment of counsel. Accordingly, Petitioner's request for the appointment of counsel is denied.

VII. CONCLUSION

For the reasons discussed in this Order, Petitioner is not entitled to federal habeas relief. Should petitioner wish to appeal to appeal the court's decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate of appealability must "indicate which specific issue or issues satisfy" the

requirement. 28 U.S.C. § 2253(c)(3).

A certificate of appealability should be granted for any issue that petitioner can demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different court, or is "'adequate to deserve encouragement to proceed further.'" Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)). In this case, however, Petitioner failed to make a substantial showing of the denial of a constitutional right with respect to any issue presented.

Accordingly, IT IS HEREBY ORDERED that:

1. Petitioner's request for an evidentiary hearing is DENIED;
2. Petitioner's request for the appointment of counsel is DENIED;
3. Petitioner's second amended federal habeas petition (Dkt. No. 9) is DENIED;
4. A certificate of appealability shall not issue; and
5. The Clerk is directed to close this case.

DATED: April 27, 2012

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE